PHILIP J. KOONZ, DEFENDANT IN ERROR, v. NEW YORK MAIL COMPANY, PLAINTIFF IN ERROR.

Submitted July 10, 1905—Decided March 12, 1906.

Where a person standing in the ferry-house of the Pennsylvania Railroad Company at Jersey City, awaiting a ferry-boat coming into the slip, and, without any fault on his part, is injured by a horse, attached to a mail wagon, running away, and which had been

left standing without bit or bridle, untied, in an open space in the ferry-house—*Held*, that the question of the liability of the owner thereof was properly left to the jury, it being for them to determine whether the servant was negligent in not properly securing or restraining the horse, reasonable care requiring him to anticipate what might naturally happen in such a place, where by noises and other occurrences his horse might be startled.

On error to the Hudson Circuit Court.

This action was brought against the New York Mail Company and the Pennsylvania Railroad Company for injuries received by the plaintiff from a runaway horse of the New York Mail Company while the plaintiff was standing in the ferry-house of the Pennsylvania Railroad Company at Jersey City. At the trial, before Judge Parker, on the close of the case a verdict was directed for the Pennsylvania Railroad Company, and on the submission of the case to the jury a verdict was rendered in favor of the plaintiff against the New York Mail Company, and his damages were assessed at the sum of $1,500.

For the plaintiff in error, *Grey, McDermott & Enright.*

For the defendant in error, *James F. Fielder.*

The opinion of the court was delivered by

VROOM, J. On the 18th day of December, 1903, the plaintiff entered the ferry-house of the Pennsylvania Railroad Company in Jersey City, at about eight o'clock in the morning, for the purpose of taking the boat to Desbrosses street, in New York. He went in at the entrance from Exchange Place; there was no boat in the slip, and he was standing about midway between the dock, where it is connected with the main passageway and the gates, and about eight feet from the gates; while standing there a runaway horse hitched to a mail wagon, both owned by the New York Mail Company, ran into the plaintiff and injured him. The horse had no bridle on and no bit in his mouth.

It appeared from the evidence that the entrance for pas-
sengers from Jersey City to the ferries of the Pennsylvania
Railroad Company was on the same grade or level as the floor
of the ferry-house. The passengers crossed, for the purpose
of reaching the boats, a main driveway, for passengers and
horses, sixty feet wide and about six hundred feet long, run-
ning the whole length of the ferry-house. The slips for the
boats were on the east side of this main driveway. West of
the main driveway was the ferry station master's office, and
north of this office was an open space one hundred feet wide
along the main driveway and on the same level, in which
space was a stand for mail wagons. This space was closed
in on three sides and open only on the main driveway, and
over the top of it was the train shed and the tracks of the
railroad. There were two elevator shafts running from the
train shed to this open space, the nearest one being about forty
feet from where the mail wagons stood. The main driveway
was for the use of passengers, all vehicles using the ferry,
including automobiles. The roof of this space on the lower
floor is supported by iron columns running parallel with the
main driveway and about twenty feet apart, and being about
eight inches square.

The evidence of defendant disclosed that on the day in
question the driver of the mail wagon drove up under the
mail shed in the ferry-house, where the mail wagons wait.
He drove around a pillar there and turned his horse's face
outward—that is, to the east—and arranged his wagon so that
he had the hind wheel behind one of the iron pillars and the
front wheel "not right in front of it, but pretty near it," the
horse and wagon being about fifteen feet from the driveway.
The driver then went into the waiting-room, where he stayed
fifteen minutes or more. He did not tie the horse. When
he came out of the waiting-room he took the feed bag off of
the seat and stood right in front of the horse; took the bit
out of his mouth and the bridle off, and was putting the feed
bag over his head when he started, gave a jump or lurch to-
wards the driver, who tried to grab his nose, but was shaken
off and fell down. The horse and wagon went down the main

driveway on a run, and when the driver jumped up the horse was going down the gangway of the ferry bridge. Another driver in the employ of the mail company testified that he had known the horse for three or four months, and had driven him; that he had never ran away with him and was a quiet, gentle horse.

The plaintiff in error assigned numerous errors, relying mainly, however, upon the overruling of the motion to nonsuit, and because the judge at the close of the trial denied the motion to direct a verdict for the plaintiff in error and against the defendant in error. The trial judge gave no reasons for his refusal to nonsuit, but it was evidently for the reason that at the close of the plaintiff's case the testimony adduced showed a state of facts which called upon the defendant to make a defence. It had been shown that the plaintiff had been run down in the ferry-house and injured by a horse of the mail company; that the horse was running away, was without a driver and without a bit or bridle; also, that mail wagons, with horses, were accustomed to stand in the open shed; that the horses were sometimes feeding; that they were never tied or secured, and were often without any driver in attendance. It had also been shown that through the elevator shafts running down into the space near where the horses stood noises from the trains above could be heard, and that passengers, all kinds of vehicles, including automobiles, traveled up and down the main driveway in front of where the horse stood; these facts, we think, were sufficient to call upon the defendant to show that the accident did not occur by reason of any negligence on its part, and there was no error in refusing to nonsuit.

The main contention, however, of the plaintiff in error in urging a reversal of this judgment is based upon the refusal of the trial judge to direct a verdict for the defendant below. Reliance is placed upon the testimony of the driver, one Bauder, whose testimony has been substantially given in the foregoing statement of the facts, and also upon the proof by a former driver of the quiet character of the horse. It was insisted that there was no evidence of what caused the

horse to run away; that the horse had been for months accustomed to stand in the place where he stood at the time of the accident, and had been repeatedly fed there after the bit and bridle had been removed. Bauder testified that arranging his wagon by the pillars, he blanketed the horse, but left him untied, and went into the ferry-house to get warm, where he remained some fifteen minutes; he then came out to the horse, took off the bit and bridle, and as he was attaching the nose-bag to the horse's head the horse, without any cause given by Bauder, broke from him, threw him aside when he attempted to grab him by the nose, ran into and along the driveway and then into the gangway, where the accident occurred. The learned trial judge, in refusing the request of defendant's counsel, said: "The case seems to me to rest upon the sole question whether it was an act of negligence on the part of the driver at that time and under those circumstances to remove that bridle from that horse for the purpose of feeding him." This we think was correct, for even admitting as true the version of the matter as given by the driver, was it not for the jury to determine whether, in removing the bit and bridle for the purpose of feeding the animal, he acted with reasonable care in all the circumstances then existing, without tying him so as to prevent his running away? He testified, when asked if he could not have tied the horse to the pillar, that of course he could.

The testimony demonstrates a condition where startling sights and noises were liable to occur at any time, and even though the driver could not tell what startled the horse, the jury had a right to infer that he was startled by some of the sights and noises, and reasonable care demanded that he should have foreseen and guarded against such an occurrence.

As was said by Justice Ingraham, in *McCahill* v. *Kipp*, 2 *E. D. Smith* 413, in a case very similar to this, "the ground on which the defendant is held responsible is the negligence of the servant who had charge of the horse at the time. That negligence may be inferred by the jury from all the circumstances, without any necessity of direct proof thereof. Whatever might be the view of the court or jury

when the plaintiff rested, the evidence of the defendant's servant who had charge of the horse shows that at the time the horse became frightened no efforts were made by him to guard against running away, either by tying him or by anyone having hold of him so as to prevent it. The witness says he seized hold of the horse after he ran, but could not hold him. If he had held the reins, or had held the horse after the fright, he might have prevented the accident. Whether this was sufficient to satisfy the jury of the defendant's negligence was for them to say. It is enough to sustain their finding, even if we differed with them as to the result." He adds: "It is not material what frightened the horse, if he was not properly taken care of so as to prevent his running."

Again, in *Phillips* v. *DeWald,* 79 *Ga.* 732, the court says: "Every horse whatever, no matter how gentle and amiable, must be properly attended and secured in the crowded business streets of a city, when there by the act of the owner and subject to his control. The instincts common to the species render this necessary, and of those instincts every owner must be presumed to have notice. The qualities of the individual horse have no relevancy, except as throwing light upon the means proper to be used to secure him and the kind of attendance or other precautions which common prudence requires." If this is true as to the business streets of a city, with what greater force can it be applied to the noisy and crowded conditions which exist in a ferry-house like that of the Pennsylvania Railroad Company at Jersey City.

The plaintiff in error chiefly relied upon the case of *Belles* v. *Kellner,* 38 *Vroom* 255, where it was held in this court as follows: "From the fact that a quiet, gentle horse was left standing, untied, in the public street, free from the presence of anything which might frighten or disturb him, the driver being within from five to eight feet of the wagon to which the horse was hitched, it appearing that the driver had been accustomed to use the horse in that way for many years without an accident, no inference can arise that the act is negligent." That case is very different from the situation presented to us in the case under consideration; the learned judge who wrote

the opinion distinctly stated, and the decision was based upon the fact, that in that case "there is nothing but the mere fact of leaving a gentle horse, as he had been left for years, under the observation and control of the driver. From that fact, under the conditions which must be conceded to exist in the case, no inference of negligence can arise." And he expressly says: "With what additional care he might have been charged if the horse had been left near a steam railroad track, where locomotives were passing, or in a place where fire engines or bands of music were approaching, is not a question in this case. It has been frequently held that leaving a horse untied and unattended in the street—that is, with no one near enough to control him by voice or otherwise—or to leave him in that condition in proximity to a steam railroad, or where the horse is not gentle, are circumstances from which negligence may be inferred."

In my opinion, the case of Belles *v.* Kellner has no application or controlling force in the decision of this case. The circumstances here leave no doubt in my mind as to the existence of most positive evidence of negligence on the part of the driver, and it surely was not error to submit this question to the jury. The driver was bound to anticipate what naturally might happen in such a place as this ferry-house and to consider "the chances of noises and other occurrences at which his horse might be startled, and the danger to persons or property should his horse escape." *Dexter* v. *McCready,* 54 *Conn.* 171.

The next assignments of error relied upon by the plaintiff in error were those numbered nine and ten in the filed assignments of error, and pertained to what would not be negligence for the driver under facts therein set forth. An examination of the charge shows that practically they were acceded to, the trial judge saying that while he did not know that the circumstances of the case were precisely appropriate to the case presented by the requests, still they were good law, and he had no objection to charging them.

I found no error in the remarks of the charge commenting on the case of *Hoboken Land and Improvement Co.* v. *Lally,*

19 *Vroom* 604, nor in the refusal to exclude from the consideration of the jury the services of the physician as an element of damage, nor any error in the admission of evidence.

The judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE. DIXON, GARRISON, FORT, GARRETSON, PITNEY, SWAYZE, REED, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL.   15.

*For reversal*—None.